Court of Appeals. We have four cases to be submitted today on oral argument. We'll hear the first two and then take a short break before finishing the docket. And we begin with United States v. Perkins. Mr. Hennies. Thank you, Judge Smith. Good morning and may it please the court. We're here today because Thomas Perkins, a young man with debilitating mental health conditions, faces spending the rest of his life in prison as a result of two serious errors by the district court. This has nothing to do with your issues, but we noticed that the Bureau of Prisons has him released in 10 or 12 years from now. Do I have seen that, Judge Smith, and I do not know why that's the case. Okay, I don't mean to take your time. We were just curious about that. No, I've seen that and I don't know. Okay. The two serious issues are first, the district court found that Perkins was competent to stand trial even though he was under an unfaltering delusion that cosmic forces would simply make his case go away. And second, the district court imposed a shockingly severe sentence that is more than 145 years longer than sentences received by similar defendants. And these two errors are especially troubling because the district court provided no explanation for its competency determination and it gave no reasons for its exceedingly harsh sentence. This court should reverse Perkins's convictions or, at the very least, remand for resentencing. I'd like to start with competency. And on appeal, this court must reanalyze the facts and take a hard look at the district court's competency determination. And this court applies a heightened or more searching form of clear air review. There were two separate hearings, one in 21 and one in 22? That's right, Judge Higginson. And I would agree with you if the only expert were Shute, who did say the cosmic sort of forces is his perception that he doesn't need to worry about anything. But then Browning testifies afterwards, correct? And Browning says, no, that's not it. I went through all the legal proceedings and his attorney and his consequences. And yes, he has a religious viewpoint, but he is very aware of the proceedings and therefore just becomes a bit of a battle of the experts. Wouldn't that be fair to say? No. Judge Higginson, no. I think these experts weren't even on the same battlefield. Dr. Browning ignored the elephant in the room. He didn't ignore it. He was very clear to say those religious viewpoints could be sort of angels. But ultimately, he understands the proceedings. He has strong hope, I think, is how he recharacterized the spirituality of it. He said it was a hope that he would be saved. Dr. Browning, though, was basing those opinions on other things that he reviewed, but he admitted that he did not explore these delusional beliefs with Perkins. And then on cross-examination, he was forced to admit those sound like delusions, this belief that angels are going to make the case go away, they're going to make evidence disappear, they're going to influence a judge or the prosecutor. He had to admit that, you know, I didn't explore those with Perkins. That's really inexplicable because that delusion is at the heart of this case. That delusion is at the heart of this competency matter. And to the extent that Dr. Browning opined on whether he could communicate with his attorneys and that sort of thing, we have two years of his attorneys just showing that that is not the case. These attorneys repeatedly raised incompetence. They said, we can't communicate with him. He is under a delusion that this case is going to go away. He doesn't understand the consequences. He doesn't think he's in legal jeopardy. So in that case, Dr. Browning's opinion, you know, on these tests that he could communicate with... When the government offered the plea to count one with a 20-year max instead of 150 plus, did the attorneys say on the record, we told him to take this plea, but he said the angels are going to free him of everything? Was that explicitly stated as the reason he turned the plea down? I don't believe it's that explicit, but they said that Perkins wasn't even willing to, you know, engage in plea negotiations. Because of the religious delusions? Right. Yes? That's in the record? Yeah. During the competency hearing, you know, counsel said he's not making these legal decisions, these life-altering decisions based on elements, based on evidence, based on burdens of proof. He's making them on the delusion that these two angels are going to release him from prison and make his case go away. And, you know, these attorneys were very straight, you know, they said, we're not raising this out of gamesmanship. We don't like to raise competency. And that's because, you know, competency doesn't make this case go away. It's just the beginning of a long road for Mr. Perkins. He, you know, if this court reverses the district court's comment. Is it relevant to our overall assessment of competency that that same defense was pretty much given to the jury, either for nullification or scienter, and then it was definitely given again to the judge at sentencing for leniency, but neither the jury nor the judge seemed to think that those, the sex demon and the angels were mitigating or nullifying. Do you agree that they were presented, the same thing was presented, not in the guise of competency, but in the guise of scienter and then ultimately leniency? I agree the same things were presented, but I don't think that that is relevant to competency because competency is really, you know, can he assist his attorneys and does he understand the consequences of these proceedings? And nothing that happened at trial, that wasn't before the jury. There was an insanity defense and there was could he knowingly have possessed, but nothing about trial resolved whether he could assist his attorneys or whether he thought he was actually in legal jeopardy. And then at sentencing that was presented as mitigating factors and we have, you know, a separate argument on sentencing, but the fact that the district court who had already found him competent rejected similar issues at sentencing is not relevant to the competency analysis here. And I think Bruce, this court's decision is really quite on point. There was multiple schizophrenia diagnoses. That's the same here. Schizophrenia in this case is not a made for litigation diagnosis to try to get out of these crimes. This is something that happened well before and nobody, you know, no doctor doubted that diagnosis until the BOP doctors came in and said, oh, you know, we don't think he's suffering from schizophrenia. Browning reduced the angel focus to this young man's apparent sort of 10-year focus on his computers, that he's just an intensely homebound child who's got angels in his head and then he's got computers with just endless porn on them. And Browning said, you know, these are just sort of obsessivenesses, but they don't interfere with his ability to see the trouble he's in. It's true that he's homebound. It's true that he does listen to angels. But again, Dr. Browning, when he was pressed, when he was read a portion of the report that said Thomas Perkins thinks that angels are going to make this case go away, they think they're going to make evidence disappear, he said that sounds like a delusion and delusions are a hallmark of schizophrenia. This long-standing diagnosis that Perkins has had since he was a teenager. Well, what would the relief be? I mean, three experts have looked at it and two said he was competent. So if you're right, what's the relief? We just have to, Shute's testimony was much shorter in length. He pretty much stopped at angels. Correct me if I'm wrong. He only had a two-and-a-half-hour interview with the young man. His assessment was based on what Perkins told him. That's a flaw. You could credit Browning, who did more than that. It was based on what Perkins told him. It was based on the fact that Perkins had told other people the same thing, and it was based on the fact that he had a long history, again, of the schizophrenia diagnosis. And as to the relief, the relief would be to, Perkins would be committed to the custody of the Attorney General, and they could see whether there's a reasonable probability that his competency could be restored and that he could be tried consistent with the Constitution. So that's the relief. Again, this is not making the case go away. I have to say that, I forget the name of the first expert in May of 21. Dr. Biber. Our opinion would probably have to say, just as a matter of law, those two assessments of competency are wrong. I don't think you would have to say that they're wrong necessarily. I think Dr. Biber was an earlier point in the case. It was kind of a transitional period, and by a year later at the second competency hearing, the government never introduced her testimony. They never called her as a witness, so the defense never had a chance to cross-examine Dr. Biber. What Dr. Biber, in her, she even admitted he has some impairment about whether he can appreciate the consequences, but a year later it became apparent that this isn't some impairment, this is a fixed belief that is not amenable to change. And she also acknowledged that he has persistent optimism. Again, by a year later, that's different. And then, as to Dr. Browning, he simply did not explore these crucial things, and there's no square conflict between his opinion and Dr. Shute's opinion, because they, you know, there wasn't a true battle of the expert. They weren't looking at the same thing, and that really is inexplicable here. I'd like to shift to sentencing, and the first issue here is the district court just simply did not explain its reason for varying so dramatically from the guidelines. And Bostick is directly on point here. It's a case with a much smaller variance, it was 17 years, and a more fulsome explanation by the district court, it at least cited one of the 3553A factors, and this court said that's still not enough, we have to reverse for the district court to explain the sentence, and that's the case here. And, you know, to be frank, I think a lot of the lack of explanation was there was confusion at sentencing, whether sentencing on multiple counts like this is a variance, is it not a variance, the government kind of sprang this, you know, consecutive sentence at sentencing a little bit out of the blue. Well, the government was not sure it wanted consecutive, possibly, potentially. It wanted high end. It wanted high end, and it was— Court goes low end, but stacks every single one online. Right, and so— And that's a variance, and the court realizes it at the end, and— And doesn't say anything about it. So, you know, the error there is that we remand for resentencing and give the district court a chance to explain itself, and hopefully, you know, in explaining its reasoning, it will realize that 157 years is too much for this particular offense. But then, I mean, there's just no question that 157 years is too much. I mean, that's just beyond the realm of reasonableness in this case. There are no aggravating factors that require life in prison for Mr. Perkins, and we go through them, and— Substantive—substantive unreasonable or is into procedural. We don't know what the explanation is, but in order for it not to be substantively unreasonable, the district court would have to deal with the aggravators and the mitigators, correct? Is that essentially right? I'm sorry— Right. Totality— We don't really— Yeah. But, you know, we have a 2,000-page record— Right. —for first offender, no criminal history, but to be frank, I think the analysis is, are there any aggravating factors? We have, you know— Well, the letters—the letters from the victims are certainly aggravating. Sure, but, you know, and this is a terrible offense, and these images are terrible, and so we're not here condoning that conduct, but this is a harsh guideline. You know, Section 2G2.2 is a harsh guideline, and still courts, the vast majority of defendants without this, you know, serious mental health concerns are getting downward variances from that guideline. So, you know, that is one. I think, really, there's just no case that, you know, us or the government have found that is even in this ballpark. And when this court— What's your guess as to why the district court stacked without explanation? I frankly have no idea. I think, again, it's possible that the confusion at sentencing, there was not completely clear what was going on. The district court said, I'm going to, you know, give the low end and then stack them, which— Did the parents testify? They did not, but they submitted a letter to the court. The court letter said, we knew there was child porn on these computers for all 10 years, and— I think that they had seen child pornography on these computers at some point earlier. I don't know whether they knew for the entire 10 years, and they had asked them not to download it. But, you know, just very quickly, when this court has affirmed high variances, usually they are, you know, measured in terms of months and not in terms of centuries, like we have here. But there's always significant, significant aggravating factors. So in the Abare case, it was an 85-year variance. That's the only one that's even really somewhat close. But, of course, a police officer killed someone while committing bank fraud. That's bank fraud. And so that's a huge aggravating factor. In Diehl, it was 28 years for someone who produced child pornography, but he repeatedly sexually abused three children over and over and over. So there has to be a significant aggravating factor to get it up even close. But here we have, you know, mitigating factors and mental health conditions that should keep it very low. So with that, we would ask— Isn't there some indication in the record that the court may at some point later in the proceeding recognize that it may have made a mistake and that this might come back? Is that an accurate representation? That's right, Judge Smith. So three days after sentencing, Perkins filed a motion for reconsideration or a Rule 35a motion that raised two points. It said, you know, we don't think that you explained this variance properly, and if you did, we might have missed it. And second, it said, we think that this is just too high considering all the circumstances. And the district court didn't rule on that motion. A few weeks later, it entered its judgment, and at that point, 14 days under Rule 35a, it elapsed, and the district court didn't have jurisdiction. And then the district court did grant the motion and said, I'll look at this again. But at that point, you know, Perkins' attorneys told him, you no longer have jurisdiction, and he kind of said, if it comes back, we'll deal with it at that point. All right. Thank you. You've saved time for rebuttal. Ms. Hannings, thank you. All right. I'm going to let you pronounce your name, because I'm probably going to mess it up. May I please have the court, Elizabeth Berenger from the Western District? Berenger. All right. Yes, Your Honor. Good morning. I first want to address the procedural reasonableness. I feel like it's sort of the major issue in the case. And first, I want to talk about the standard review, which is plain error. The defendant did not object to the court's reasons, I believe, because the reasons were pretty clear at the hearing, why the court was running them consecutive to each other, but didn't object. That motion to reconsider three days later was not sufficient to raise an objection to the procedural or substantive reasonableness. Well, he'd already raised the objection to the substantive reasonableness. It's not something that Rule 35 could have remedied. That's what the government argued when it responded to the motion later. Rule 35, as the advisory committee notes, does not preserve error that was not made at the time the ruling was made under Rule 51B. So I just want to talk about the standard of review, which gives us a prism to sort of evaluate the substantive reasonableness. I'm not sure I agree. Rule 35 is the device to tell a district court if it committed clear error. And as the district court later recognized, he had because, at least this is how I look at the sentencing transcript, it wasn't until page 47 he says, oh, my goodness, if that's an upward departure, then that's what I'll give you. I think the discussion of the variance versus whether he was, that's just taxonomy. The court knew that it wanted to revise. I don't even know what the word taxonomy means. What? I'm sorry. Taxonomy. What do you mean by that's taxonomy? Whether it was within guidelines or a variance, I think that there was some confusion in just the vernacular of that, but the court knew that it wanted to impose consecutive sentences, whether it was talked about as consecutive sentences or it was talked about as a variance. Well, each time the court asked the government, the government says possibly, potentially about stacking. So I don't see any certainty the court was going to stack. By the end. By the end of the sentencing. Page 47. And the statement of reasons, the court was very. That's not even in the oral transcript. But Rita says that we can consider not just the affirmative statements at sentencing, but we can also consider that statement of reasons to give us context and record in evaluating what the court's reasoning is. And look at. If the statement of reasons that said here are the five, 3553 factors, but instead it just said refer back to the transcript. Well, I'd like to unpack that a little bit, because if we're looking at the procedural reason list under plain air review, we're looking at the context. Well, I'm not agreeing that this is plain air review. I think this is classic de novo because the defense attorney did two really good things. He clarified the court and the government that they were dealing with an upward variance. That's what chapter five says. So at the very end, it's up to the defense attorney to say you are all wrong. This is a variance. Consequence is you've got to explain. No explanation. Then lawyer says within the time period for rule 35, you can correct this. We're going to have to agree to disagree about the standard review, because when the court gives his reasons, he says, is there anything else? Is there anything else? I want to run these consecutive. And defense counsel says no. But then three days later, after the ruling has already been made, after the time for 51B says you should make your objection, when the ruling is sought and when the order is made, I'm fumbling up the language of that, it's too late. Rule 35 is not meant to preserve error after the sentencing hearing. It would have been very easy for the defense counsel to say, wait, you're running it consecutive? Why are you doing that? You just said you were denying you thought that the guideline range mattered. That would have been the time to clear it up. And now we have this discussion about what the court's reasons are way after because there was no objection. That's the point of plain error review. What does Watkins say about standard of review here? So Watkins was a very unusual case because Booker was decided immediately after the sentencing before the 14 days had expired. And in that case, of course, the court committed clear error. There's a Supreme Court opinion directly in point about whether the guidelines were mandatory or not. And we know that from Henderson, and I believe that part of Henderson survives the Supreme Court's reversal in that case. So I don't think Watkins applies in this case. Watkins was pre-packed. That's a strong argument, so we'll study it. You probably want to move to whether it's clear error or no error. Because you're arguing it's no error, right? I'm arguing no error. I think it's the defendant's burden in plain error, so I think that makes it more beneficial. The whole point of procedural reasonableness is to make sure that you judges know what the court decided, and we know the reasons the court gave the variance in this case. It's very clear from the context in the record. We have a 50-page sentencing record. Nine pages is the court, the government, giving specific reasons why a variance is appropriate, tied to the 3553A factors. We have this back and forth between the judge and the government during those nine pages where the AUSA, especially directing the court's attention to 1101 and 1102, the government will make an argument and the court will say, right. The government will make an argument of the defendant's predation and how he is still, he touched a child inappropriately, a 10- to 12-year-old. And the court says that's in paragraph 32, right? So the court is tracking the government's argument. It's agreeing with the government's argument. Well, but Mr. Greenbaum is saying I want high end, potentially consecutive. Yes. And he says again, high end. Yes. Possibly consecutive. Yes. And then the court clarifies not to vary outside the guidelines, to give the high end and run them all consecutive. Correct. That's correct. But then if the court makes very clear at the end that it intended, I don't know what you call it, I don't know whether it's a variance or whether it's not a variance, but I want to run these counts all consecutive. And in its statement of reasons, which this court in Keyes and several other cases, Bonilla, Cotto-Martinez, says the statement of reasons supplements those reasons at the hearing to give context to the court's decision. And it says, one, it's granting the government's motion for variance, and two, for the reasons given in open court. So it's adopting the government's. Bonilla was also given in the PSR where they had recommended, but PSR and the government never get close to 150. That's true. But the court did that. This court gave a stiff sentence. There's no doubt about it. And that's why it was so solicitous at the hearing. It gives the opportunity, many opportunities. Do you know in any case we've ever affirmed in the Fifth Circuit where the upward variance is over 100 years? So if the court wants me to move on to substantive reasonableness, I'm happy to do that. Substantive reasonableness of the sentence, it's a stiff sentence. But the standard of review for this court is abusive discretion, and it's determining whether the court considered an improper factor, whether it didn't consider something it should have, or whether it had clear error. Those are the three, and the one I'm just sort of mystified looking at this transcript is where was any consideration of his mental health? It was the case from start to finish, and there's no discussion of it. It sounds like you're substituting your judgment for Judge Count's. No, I want some assessment. Was his mental health an aggravator? Was he tormenting children somehow? So this court, for Judge Count, sat over the competency proceeding. He sat over the trial. He read an exhaustive sentencing memorandum laying out those mental health factors. It asked the government at sentencing to address that mental health aspect, and in its discretion, it determined that it was not a factor that merited part of the sentence, and this court may disagree. We never say that. The mental health merits no discretion. I don't know that he needed to exhaustively state that. Not exhaustively. Any comment about autism and the delusions about a sex demon. So he agreed with the government's assessment of that, and the government addressed it in depth at the sentencing hearing. When he granted the government's motion for variance and he said the reasons stated at the hearing in the statement of reasons, he was adopting the government's comments and the government's arguments in its motion for variance, and the government exhaustively discussed it. This is the same government that offered him a plea to a maximum of 20 years. Well, the plea we offer, Your Honor, is not what we believe to be a reasonable sentence. It's something that we offer at the beginning of a case to avoid going to trial, and so that's a very separate question of what we think the defendant should get under 35 to 3A. Where do you think, I mean, you're going to reach competency, and I need to ask you a question so you can, but where does the government think, I mean, no one's disputing he's autistic, no one's disputing he's homebound, and no one's disputing he's the first offender. Those are all big mitigators. Do you think they're relevant as to competency only, as to scienter? I would have thought they're relevant to sentencing leniency, but there's no discussion of any of them. There is a discussion. By the court. By the court. The court's reasons are sufficient to permit effective review, which is all that's required. Did the court ever mention any of those three factors when it crafted its 150-year sentence? Yes or no? It adopted the government's reasons, which discuss it in depth, and we do have a case key where the court did the same thing, where it adopted the government's reasons when the government went into great depth about a topic. When you adopt the government's reasons, that becomes the reasoning of the court. Remind me what the government said at sentencing about him being a first offender. Did the government say anything? It did not mention his first offender. Did the government say anything about his being homebound? Many child pornographers are first offenders. I know, but you said it adopted the government's reasoning. Did the government say anything about being homebound as an aggravator somehow or not relevant? Well, first of all, we disagree that he's homebound. He obviously attended church, so he's not exactly stuck in his house. And he went to college in the past, so I think that's a little inconsistent in the record as far as being homebound. Did the government say anything about the autism at sentencing? Yes, it did say about the autism, and it said it didn't affect his ability. I mean, he hid these. He had the wherewithal to hide the child pornography, put it under someone's folder's name on his computer, use multiple VPNs, try and keep it secret. So his appreciation of the wrongfulness, his predation. So there was a series of offense. I do want to mention that this 100,000 images, this is the most I have ever seen as a prosecutor in almost 20 years. So 100,000 images, 70,000 of those are unique. The prosecutor said during his sentencing that the eight hard drives that were completely full were falling off the table at the trial and reminding the court of just how staggering the amount and the offenses of children being raped, children being sodomized. These are prepubescent children. And connected with that were sort of these predation factors and the danger to the community. So we not only... You offered him 20-year sentence for a plea. It's a horrendous thing. With all this amount that you're talking about now, you plea bargained this for 20 years, and he turned it down. You know, it's not the prosecutor's call and the plea bargain. I'm not asking what your call is. I'm just suggesting to you that there's a total inconsistency in the price you put on not going to trial, and then you flip the other direction about given this horrendous amount of images and so on and so forth. To me, this case cries out for a hearing of some kind that squares us away. I mean, this was a lengthy sentence in hearing. It sounds like you disagree. Maybe the prosecutor who offered the plea bargain might have come to a different. But that's none of our calls. It's the district court's job. He did not abuse his discretion. He made a plausible interpretation tied to the 3553A factors and the reasons in the 3553A factors for why he gave this stiff sentence. What relevance is Judge Smith's question that he actually said, I didn't do my job. I missed it. I interpret that very differently. I think that the motion to reconsider suggested that defense counsel was surprised. Judge Counts is a very solicitous judge. As you can see from the record, he likes to give people the opportunity to say their piece. He obviously felt defense counsel hadn't had the opportunity to say his piece, and he granted it. But even in that order granting it, he's like, I want to put you on notice that I'm planning to give a variance based on these sentencing factors. And then he'd explain it. We'd get to see what. Well, he did explain, Your Honor, there's enough there under RITA in the statement of reasons for you guys to figure it out. Doesn't this discussion bleed into the more serious issue of competency? And, again, it's the plea that makes me concerned because these child-born cases you've done a lot, prosecutions, there's almost nothing ever to try. As soon as the jury sees these images, they're guilty. So they almost all plead. This guy didn't plead and isn't that consistent with the expert saying he did think he had no jeopardy. He couldn't understand jeopardy because he had a profound, zealous belief in angels, delusional belief. Well, I have a few remarks versus we're under a clearly arbitrary standard. And so under this court's precedent, Dr. Browning's report and testimony was sufficient to support the district court's ruling in this case. But I do want to address that sort of dusky standard of whether he had a rational understanding of the proceedings. And one is that, and the most important part is that when Dr. Browning probed into this, I want to direct the court's attention to 2043, he told Dr. Browning the most likely outcome is that he would be found guilty based on evidence and logic. He, and then in the testimony, and that's page 597, Dr. Browning felt that he was just reluctant to say that he was guilty based on his religious beliefs. He would just rather have someone else find him guilty. So it's not based in delusion. His mental illness wasn't doing that. It was just he was reluctant to say that he was guilty. I thought it was also that he thought the angels were going to speak to both the prosecutor and the judge. Okay, so several responses to that is, one, we have credible testimony from Dr. Browning, and Dr. Bieber, I do want to direct the court's attention. There's some suggestion that Dr. Bieber's report that was submitted to the court cannot be considered, but the defense actually submitted it as an exhibit to, and this is 2096 to 2118 to the court, arguing Dr. Bieber's conclusion in favor of incompetency. So we, and then both experts relied heavily on Dr. Bieber's report and testing and conclusions and forming their own conclusions. But both of those felt like Perkins does not discover, suffer from delusions. He was raised in a very religious, hyper-religious background where there was the laying on of hands, so evangelical background, and his autism spectrum disorder made him express these concepts in very concrete language. But another thing is they disputed that earlier schizophrenia diagnosis. So other than the reports of sort of hearing these spiritual voices inside his head, there were no other markers of psychosis. None of the testing performed by any of the three doctors, that's at 596, showed any sort of psychotic illness. There was no other signs of schizophrenia in either his 90 days at the BOP or his time spent at that one-week hospitalization in 2020, not responding to external stimuli, no disorganized speech patterns. So according to the DSM, it's not just hallucinations that make you schizophrenic. It's also these other factors, such as disorganized speech, being able to communicate with others. Did the experts all agree as to what his developmental age was? So I don't know what you're saying. So it's not in the record. It's self-reported that he was diagnosed with schizophrenia at age 14. Dr. Bieber explains that's way too early for someone to be diagnosed with schizophrenia, and also there was no marked change. So what happens with schizophrenia, according to Dr. Bieber, is that you're fine, you're fine, you're fine, you're fine. But then you get, like, you know, early 20s, and all of a sudden there's this marked change in your ability to communicate with others, and there's a sudden onset of hallucinations and paranoia. But he'd been having trouble communicating from a very early age due to his, which is more consistent with his, autism and developmental disorder. So other than the hearing the spiritual voices, there was no other, you know, the demons and angels, there was no other signs of, according to the DSM, according to this thing. But even if we have that, even if we have delusions, the delusions did not affect his understanding of the proceedings or his ability to relate. So, yeah, you hear voices, you hear angels. Like, sometimes I hear spiritual voices. It doesn't necessarily mean that that is what prevented him from communicating with his attorney. If you look at Dr. Browning's report, he was able to express his understanding of the proceedings, able to come to rational decisions, which clearly he disagreed with his counsel about the wisdom of those strategies. I came away with the impression, I'm no expert, that he could communicate quite well. Yes. But he had this absolute certainty that he faced no legal jeopardy because the angels would intervene. I disagree with that mostly because of Dr. Browning's report on 2043. It said he recognized he was probably going to be found guilty by the evidence and logic, but he just, he didn't want to take the plea. And, you know, defendants do lots of things for lots of reasons. A lot of times they go to trial when there's no hope, and their defense counsel says, this is crazy. You should absolutely plead guilty to this. And defendants have their own agenda sometimes. In fact, one of the cases cited by the defense talked about this very reason that you sometimes, I think it was Gain from the Eighth Circuit, that a lot of times criminal defendants just don't agree with their counsel, and that disagreement doesn't mean that they don't understand or that they don't have a rational understanding. It means they have a different agenda. What was the letter that was referenced, submitted to the district judge by the parents? You know, I never got that in the record, and I even requested the sealed records, and that wasn't in my record, so I didn't have access to that. But I do know that the parents, I see my time is running out, but the parents during the pretrial sentence report expressed fear of the defendant, that they'd gotten an order of protection. There's evidence in the record from him. And I think that they'd worked something out after his hospitalization, but it was a very difficult road for them, too, where things were in their name. They came to the father's workplace thinking that he was the person that downloaded the pornography. So I think that they had a hard road as well. But if there are no other questions, I see the... You heard my question about the Bureau of Prisons that are showing a release date of maybe, like, 2035 or something. Do you have any idea what's going on? I don't, but I will get to the bottom of it, and I will file a letter with this court after I talk to them. We're just... I'm not suggesting it has anything to do with the issues on appeal. Right. It just looks a little bit strange. Something might have gotten mistranslated from them when they did the sentence, but I can easily check in with my BOP contact and figure out what's going on, and I'll let the court know if I find anything. All right. Thank you, Ms. Berringer. Mr. Hennings for rebuttal. Thank you. I'd like to just briefly start where the government left off with competency. And I think this just really comes down to those people in the best position, as the Supreme Court has said. Perkins attorneys, they repeatedly, every single stage of the proceedings, said, we can't communicate with him. He is under a delusion. That is one of the prongs, is ability to assist your attorneys. I don't think the government, you know, is arguing that Perkins attorneys were raising competency of bad faith or that they were somehow, you know, trying to skirt the court. They were acting as officers of the court. They repeatedly said, we can't communicate with him. That has to receive great weight. I want to go to procedural reasonableness. This is de novo review. This is not plain error. The objection in the 35A is for clear errors. And this court said in Mondrago and Santiago, the requirement to explain a sentence is clear error. We did everything that, you know, required to preserve an error. We gave the district court, you know, we alerted it to the error, and we gave it an opportunity to correct that error. In Watkins and in Hatley, this court corrected at that point. It isn't technical and arithmetic and clear as contemplated to be equivalent. This would have required pulling the defendant back in from BOP, having a whole other sentencing. This alleged error is one of explanation that would require full sentencing. So it doesn't really seem like the technical, oh, you made a mistake when you filled out the sheet. I don't know. Right? I mean, the error you're alleging is there's just got to be more discussion at the sentencing hearing. So this error, if you're right, that's not really in the world of Rule 35. Well, it's still a clear error that, you know, the district court had the ability to do that. And it would have preserved some judicial resources to do it then instead of having to come back and, you know, do it again once. Why do you think the defense attorney didn't say, now that I've told everyone this is an upward variance, you've got to explain? I can't speak for the defense attorney. That sounds sort of like not objecting. Right? If the whole point is we needn't. So you agree the only way the objection occurs is the Rule 35? Right. And, again, this suggestion kind of came out of the blue. There was a lot of confusion in trying to figure out what was going on. But we did bring it to the district court's attention as soon as possible. Counsel, what do you really want this court to do? Set it back with instructions to do what? Well, first, we want to reverse the convictions on competency grounds. Second, if we get to the sentencing, remand for resentencing to explain the reasons for the sentence and to hold that the sentence that was imposed is substantively unreasonable because it's, you know, dramatic. You know, it's a staggering disparity between Perkins and every other defendant that is sentenced. I don't think it's substantively unreasonable. Correct me if I'm wrong. I don't think it looks across cases. I think opposing counsel did describe the three elements. And I don't, right? It's a clear error balancing the sentencing factors. Right. But it would have to be that things were overlooked here that are mitigating. I think that is certainly a fact. You heard opposing counsel say, well, in fact, all the mitigating elements did come up in extensive dialogue with the government. So the government says that the district court adopted the government's reasons, but the district court never says that. The district court only says when it thinks it's imposing a within-guidelines sentence that the 3553A factors apply. And then when it said it's varying, it didn't say anything else. But going back real quick, I mean, to the disparities, that is absolutely relevant on appeal. In the Booker remedial opinion, going to Rita and Gall, it's clear that Booker and the Supreme Court intended courts of appeals to review for substantive reasonableness to promote Congress's intent when they enacted the Sentencing Reform Act. And that's predictability, uniformity, and fairness, and acting as a check on disparate sentences under 3553A-6. So, absolutely, this Court acts as a check on disparate sentences between defendants. And that's why the Booker remedial— It's a metric for determining what is substantive error so long as the statutory scheme allows for that sentence. Uh, sorry. I assume that the statutory basis for a sentence arranged to be opposed. And my question to you is, what is your metric for when it becomes substantively unreasonable? In other words, substantively unreasonable, you're implying that it's procedurally okay, and the law contrary, but there's some other metric that this sentence should stand. I mean, it's a long sentence. It's kind of hard to serve it. But that just sounds like up to a point, that doesn't really mean that much. It is a totality of the circumstances analysis, and it's one that, you know, the district court has a great deal of discretion. I don't know if the totality of the circumstances doesn't help me any more than substantive unreasonableness does. Sure. But I think we don't dispute that the district court has a great amount of discretion. But this Court itself has held that that discretion is not unlimited and that this Court acts as a check on extreme sentences. So when you have a sentence that is so far out of the ballpark of what other defendants receive, that is not taking into account what Congress intended in the Sentencing Reform Act to create fairness, predictability, and uniformity among other, you know, among multiple defendants accused of the same crime. All right. Thank you, Mr. Kinnings. Thank you. Your case is under submission. Next case, Johnston.